JAMES T. WINKLER, ESQ., Bar # 6536
ROGER L. GRANDGENETT, II, ESQ., Bar #6323
LITTLER MENDELSON, P.C.
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
Telephone:    702.862.8800
Fax No.:        702.862.8811

Attorneys for Defendant
PWI CONSTRUCTION, INC.

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| TRUSTEES OF THE CONSTRUCTION INDUSTRY AND LABORERS HEALTH AND WELFARE TRUST; TRUSTEES OF THE CONSTRUCTION INDUSTRY AND LABORERS JOINT PENSION TRUST; TRUSTEES OF THE CONSTRUCTION INDUSTRY AND LABORERS VACATION TRUST; TRUSTEES OF THE SOUTHERN NEVADA LABORERS LOCAL 872 TRAINING TRUST,<br><br>Plaintiffs,<br><br>vs.<br><br>PWI CONSTRUCTION, INC., a Nevada corporation,<br><br>Defendant. | Case No. 2:12-cv-00809-GMN-PAL<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Defendant PWI Construction, Inc., (hereinafter "PWI" or "Defendant"), by and through its attorneys of record, hereby submits its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (FRCP). This motion is made and supported by the attached Memorandum of Points and Authorities, the Declaration of Marc Ferguson attached as **Exhibit A**, the Declaration of James T. Winkler attached as **Exhibit B**, the supporting exhibits attached hereto, and all other papers and pleadings on file herein.

LITTLER MENDELSON
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Pursuant to the Complaint, Dkt. #1, this action arises pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1500. Plaintiffs are the trustees of various union trust funds ("Plaintiffs" or "Trust Funds"). The only claims the Trust Funds make in their Complaint are that "PWI is obligated to make its books and records available for contract compliance review ('Audit')," that "PWI has failed to make its books and records available for Audit," and that the Trust Funds have had to "obtain the services of an attorney to pursue this action." Complaint, Dkt. #1, ¶¶ 6-8. The Trust Funds base their claim on two things: 1) a memorandum agreement ("Memorandum Agreement") purporting to bind PWI to a master labor agreement ("Master Agreement") with the Laborers International Union Local No. 872 ("Union"), and 2) various remittance reports submitted by an employee of PWI purporting to acknowledge that PWI was bound to a labor agreement.

In this motion, PWI will show four critical things entitling it to summary judgment: 1) the Trust Funds have not presented any evidence demonstrating that an authorized agent of PWI signed the Memorandum Agreement or that the person who allegedly signed the Memorandum Agreement actually signed it; 2) the remittance reports are insufficient to bind PWI to the Master Agreement; 3) that the Trust Funds' sole claim is moot as PWI has provided the Trust Funds all of the information they requested so that they may perform their audit; and 4) even if PWI had ever entered into the Master Agreement (which it did not), it has since repudiated the Master Agreement pursuant to the Ninth Circuit's one-employee unit rule. As the Trust Funds cannot show that PWI is bound to the Master Agreement, and as PWI has actually complied with the Trust Funds' request for documents enabling them to conduct an Audit, PWI is entitled to judgment as a matter of law.

## II. STATEMENT OF UNDISPUTED FACTS

### A. General Background

PWI is a general contractor in the commercial construction business, focusing on remodeling work in the retail and hospitality industries. It also performs general contracting work in the solar power industry. **Exhibit C**, Deposition of John Lavelle a/k/a Jack Lavelle, 13:15-23. As a general

LITTLER MENDELSON
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

2.

contractor, PWI provides its clients with project management services for construction projects, not actual physical labor or construction work. **Exhibit D**, Deposition of Marc Ferguson, 14:14-15:11. More specifically, it seeks bids and contracts with various subcontractors, who provide the actual labor and construction work on the construction projects that PWI oversees. *Id.* As a rule, PWI does not provide labor itself as its employees are not suited to or trained to actually do the various bits of construction it supervises. *Id.*; see also **Exhibit C**, Lavelle Depo., 22:13-22 (In responding to a question regarding whether PWI Project Managers do any physical labor on job sites, Lavelle responded "No. They'd get hurt.")

In a normal project, there are three levels of PWI employees that may be involved in the field: 1) a senior project manager, 2) project managers, and 3) superintendents. **Exhibit E**, Deposition of Jason Leach, 21:1-3; **Exhibit D**, Ferguson Depo., 14:6-12. The duties of project managers and superintendents are also somewhat interchangeable. **Exhibit F**, Deposition of David Mitchell, 9:23-25. Jason Leach was the senior project manager in charge of the only hospitality project PWI had in Nevada in 2007, the Planet Hollywood project. **Exhibit C**, Lavelle Depo., 15:3-9. Leach's supervisor was Marc Ferguson, PWI's Vice-president, who was in charge of all hospitality projects and who was (and is) located in Mesa, Arizona. **Exhibit E**, Leach Depo., 54:20-55:5.

### B. The Memorandum Agreement

The Memorandum Agreement at issue here was allegedly signed by David Mitchell, a project manager on the Planet Hollywood project, in July 2007. **Exhibit G**, Memorandum Agreement. Mitchell was first hired by PWI three months earlier, in April 2007, **Exhibit F**, Mitchell Depo., 10:5-7, and was in training under Jason Leach. **Exhibit E**, Leach Depo., 21:6-21. PWI never authorized Mitchell to sign any contracts on its behalf, and he knew he did not have authority to sign contracts for PWI. *Id.*, 54:20-55:5; **Exhibit D**, Ferguson Depo., 64:25-66:23; **Exhibit F**, Mitchell Depo., 47:3-48:17. Mitchell has no memory of having signed the Memorandum Agreement, or even having seen it prior to this litigation. **Exhibit F**, Mitchell Depo., 37:20-39:6. He cannot verify that the signature on the disputed document is actually his. *Id.*, 38:14-15, 52:13-22. Nor is there any testimony or other evidence that he signed the Memorandum Agreement.

LITTLER MENDELSON
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

### C. PWI's Use of Labor Employees

During the Planet Hollywood project, PWI began its first and almost only direct hiring of labor workers. **Exhibit D**, Ferguson Depo., 14:14-16:11. Previously, PWI had contracted with a firm called Labor Ready on the rare occasions when the subcontractors with whom it had already contracted were unable to provide all of the necessary labor for a project. *Id.*, 16:5-11; **Exhibit C**, Lavelle Depo., 27:20-28:16. Such Labor Ready workers were employees of Labor Ready and were not employees of PWI. **Exhibit D**, Ferguson Depo., 38:4-14. However, after being repeatedly badgered by a trespassing union representative at the Planet Hollywood jobsite, Jason Leach (in consultation with Marc Ferguson) decided to hire union laborers to do some excess clean up on the project. **Exhibit E**, Leach Depo., 62:9-13. In conjunction with hiring union laborers for this single project at Planet Hollywood, April Lynn Meneou, a payroll employee at PWI's corporate office in Mesa, Arizona, was sent, filled out, and returned remittance reports detailing contributions to various trust funds. **Exhibit H**, Deposition of April Lynn Meneou, 22:16-25, 25:17-22. Meneou was the only PWI employee who actually saw these reports prior to the initiation of this dispute. **Exhibit I**, Deposition of Mary Lynn Lipka, 25:5-12. April was and is a payroll employee in the accounting department. **Exhibit H**, Meneou Depo., 10:1-8. She also did not have the authority to bind PWI to a collective bargaining agreement. *Id.*, 10:11-14; **Exhibit I**, Lipka Depo., 27:10-28:9. Nor did she ever inform anyone with authority about the remittance reports she was submitting. *Id.*, 24:18-25:16. Nonetheless, she did fill out reports which stated that she was authorized to make the "certification and/or acknowledgement" in the remittance report, including that PWI was a "signatory and bound to the applicable project agreement, shop agreement, or current master labor agreement (MLA) of the Southern Nevada Laborers Local 872 ...." **Exhibit J**, Remittance Report. Plaintiffs have not presented any evidence that Meneou had authority to bind PWI to a collective bargaining agreement by signing the remittance reports, other than the wording on the forms that the signer of the document had such authority. **Exhibit H**, Meneou Depo., 25:23-26:7.

The only time that PWI has directly hired workers, other than on the Planet Hollywood project, was after PWI was made aware of the allegations that it was party to a labor agreement with the Southern Nevada Laborers Local 872 ("Local 872"). **Exhibit C**, Lavelle Depo., 24:22-26:4,

42:8-19, 43:2-44:2. At that time, PWI paid two union laborers to do some clean-up work, both for roughly two weeks. *Id.*, 36:9-37:7. PWI has not otherwise paid or directly hired employees to perform construction work in the field. Also, PWI has discontinued using Labor Ready or any other miscellaneous labor subletting. **Exhibit D**, Ferguson Depo., 19:6-19; **Exhibit A**, Declaration of Marc Ferguson, ¶ 8.

### III. LEGAL ARGUMENT

PWI is not bound by the Master Labor Agreement with Local 872 either by the Memorandum Agreement or any subsequently submitted remittance reports, as the signatories to those documents (and in the case of the Memorandum Agreement, purported signatory) did not have authority to sign the relevant documents. Additionally, even if PWI were bound to the Master Agreement, it has since provided the Trust Funds with the relief they sought, specifically, the books and records specifically requested by the Trust Funds to conduct an audit. Finally, if PWI was ever bound to the Master Agreement, it has since lawfully repudiated the Master Agreement pursuant to the one-person bargaining unit rule.

#### A.  Mitchell Did Not Sign the Memorandum Agreement

There are no facts that establish that Mitchell signed the Memorandum Agreement purporting to bind PWI to the Master Agreement. Mitchell himself acknowledges that the signature on the paper appears to be his own, but cannot remember signing it or ever having seen it prior to when Ferguson showed it to him after this dispute arose. **Exhibit F**, Mitchell Depo., 37:20-39:6. He cannot confirm that the signature is his. *Id.*, 38:14-15. Additionally, the Trust Funds have specifically claimed that whether or not Mitchell signed the agreement is irrelevant and prevented PWI from obtaining any evidence supporting the claim that Mitchell signed the Memorandum Agreement. Specifically, when PWI requested the name of the "agent or representative of Laborers' Local 872 that allegedly submitted the 'Memorandum Agreement,' ... to an alleged representative of Defendant for signature," the Trust Funds responded that it was irrelevant to this litigation because PWI had submitted remittance reports. **Exhibit K**, Plaintiffs' Responses to Interrogatories, Interrogatory 1 and response thereto. The Trust Funds also claimed that "all of the facts of the alleged execution of the 'Memorandum Agreement'" are irrelevant to this action. *Id.*, Interrogatory

2 and response thereto. Additionally, the Trust Funds failed to name any "individuals with knowledge regarding the execution of the 'Memorandum Agreement,'" claiming that the execution was irrelevant. *Id.*, Interrogatory 3 and response thereto.

Given that Mitchell does not remember signing the Memorandum Agreement, does not remember ever having seen the Memorandum Agreement prior to this dispute, and the Trust Funds' refusal to provide any information regarding the execution of the Memorandum Agreement, there is no evidence now admissible that Mitchell actually signed the Memorandum Agreement. Further, because of their refusal to provide such information, such evidence may not be submitted in this litigation. Thus, the only evidence regarding the execution of the Memorandum Agreement is that Mitchell had never seen it prior to the initiation of the dispute between Local 872, the Trust Funds, and PWI. **Exhibit F**, Mitchell Depo., 37:20-39:6.

### B. Mitchell Lacked Authority to Sign the Memorandum Agreement for PWI

The undisputed evidence shows that Mitchell did not have actual, implied, or apparent authority to bind PWI to a union contract by signing the Memorandum Agreement (even had he actually signed it).[1] Under the National Labor Relations Act ("NLRA"), common law agency doctrines govern a principal's responsibility or liability for the acts of its agents and purported agents. 29 U.S.C. § 152(13); *see also NLRB v. Iron Workers of the State of Cal.*, 124 F.3d 1094, 1099 (9th Cir. 1997) ("Under the NLRA, common law agency principles govern the Union's responsibility for the actions of its officers and members.") Thus, in determining whether David Mitchell could bind PWI to the Master Agreement by signing the Memorandum Agreement, the common law of agency controls.

Under Nevada law, an agent binds a principal only when it acts under "actual . . . or apparent authority." *Dixon v. R.H. Thatcher*, 742 P.2d 1029, 1031 (Nev. 1987); *see also Iron Workers*, 124 F.3d at 1099 (stating that "without actual authority, [an agent] could bind the [principal] only if he had apparent authority"). Both actual and apparent authority depend on the objective manifestations

---

[1] The Trust Funds' refusal to provide any information regarding the execution of the Memorandum Agreement, including any information regarding Local 872 and its representatives' knowledge or beliefs regarding Mitchell's authority also tacitly acknowledges that Local 872 did not have a reasonable belief that Mitchell had authority to sign the Memorandum Agreement. Restatement (Second) of Agency § 8, comment c (1958).

6.

of the intent of the principal. *See Iron Workers*, 124 F.3d at 1098-99; *NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir. 1976); Restatement (Second) of Agency § 7, comment b (1958) (hereinafter Restatement) (actual authority); Restatement § 26, comments a-f (same); Restatement § 8, comment a (apparent authority); Restatement § 27, comments a-f (same). For actual authority, the principal's objective manifestations must be made to the agent; whereas for apparent authority, the principal's objective manifestations must be made to the third party. *Donkin's Inn*, 532 F.2d at 141 ("In determining whether there was apparent authority, the factual inquiry is the same as in the case of actual implied authority, except that the principal's manifestations to the third person are substituted in place of those to the agent."); Restatement § 8 and comment a; § 26; § 27 and comment a.

Put simply, "[a]pparent authority is 'that authority which a principal holds his agent out as possessing[,] or permits him to exercise or . . . represent himself as possessing.'" *Oakview Constr., Inc. v. Huffman Builders West, LLC*, 2:10-cv-00984-ECR-RJJ, 2011 U.S. Dist. LEXIS 95722, at *9 (D. Nev. Aug. 25, 2011) (citing *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 261 (1997)). "To create apparent authority, the principal must either intend to cause the third party to believe that the agent is authorized to act for it, or should realize that its conduct is likely to create such a belief." *Millard Processing Services, Inc. v. NLRB*, 2 F.3d 258, 262 (8th Cir. 1993) (emphasis added) (citing Restatement § 27 cmt. a (1958)); *see also Oakview Constr.*, 2011 U.S. Dist. LEXIS 95722, at *9 ("[A]pparent authority is created when a principal writes, speaks, or acts in a way which causes a third person to reasonably believe that the principal consents to the acts of the agent.") (citing Restatement § 27). Thus, "[a]pparent authority is created where both the third party and the principal know of the actions of the agent, and the principal fails to object even though it could have easily done so." *Oakview Constr.*, 2011 U.S. Dist. LEXIS 95722, at *9-10 (citations omitted). "A party claiming apparent authority of an agent as a basis for contract formation must prove (1) that he subjectively believed that the agent had authority to act for the principal and (2) that his subjective belief in the agent's authority was objectively reasonable." *Great Am. Ins.*, 934 P.2d at 261 (citing *Smith v. Hansen, Hansen & Johnson*, 818 P.2d 1127, 1135 (Wash. Ct. App. 1991)). Even so, "apparent authority cannot be established merely by showing that [the agent]

7.

claimed authority or purported to exercise it, but must be established by proof of something said or done by the [principal] on which [the third-party] relied." *Iron Workers*, 124 F.3d at 1099 (emphasis added). And "[a]pparent authority is not created . . . merely because the agent is appointed to or occupies a high position in the principal's organization." *Hansen, Hansen & Johnson*, 818 P.2d 1127, 1133 (citations omitted) (cited approvingly in *Great Am. Ins.*).

### 1. Mitchell Lacked Actual Authority to Enter Any Contracts for PWI

The Trust Funds have failed to present any evidence that Mitchell was authorized to sign contracts on behalf of PWI, especially at the level of collective bargaining agreements. In fact, the only evidence is that Mitchell did not have authority to sign contracts for PWI. Mitchell testified that he knew from the first day that he was hired that he had no authority to sign any contracts for PWI, and that such things went to the "ownership of the company, officers in the company." **Exhibit F**, Mitchell Depo., 47:15-17. Leach and Ferguson both corroborated Mitchell's testimony with their own and explained that he did not have authority to sign contracts for PWI. **Exhibit E**, Leach Depo., 54:20-55:18; **Exhibit D**, Ferguson Depo., 64:25-66:23. In fact, not even Leach, Mitchell's direct supervisor had authority to sign contracts for PWI as he had to send contracts to Ferguson for approval. **Exhibit E**, Leach Depo., 54:20-55:18. Thus, as Mitchell did not have actual authority to sign the Memorandum Agreement (assuming he actually signed it at all), he would have needed to have apparent authority to sign in order to actually bind PWI.

### 2. Mitchell Lacked Apparent Authority to Enter Any Contracts for PWI

Mitchell not only lacked actual authority, he lacked the apparent authority to bind a national company to a union contract. Plaintiffs have presented no evidence showing that PWI ever represented to Local 872 (or anyone else) that Mitchell had authority to sign contracts for PWI. Considering the magnitude of such an agreement, it was unreasonable for the Union to not seek approval or evidence of authority from someone higher up within the company before presuming that Mitchell could sign such a document. *See Great Am. Ins.*, 934 P.2d at 261. This is especially so if Local 872's purported belief that Mitchell had authority to sign the document (assuming he actually did) was based solely on his title as a Project Manager. *See Hansen, Hansen & Johnson*, 818 P.2d at 1133 (cited approvingly in *Great Am. Ins.*).

LITTLER MENDELSON
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

Additionally, at least one union representative knew that Mitchell was not in charge of the Planet Hollywood job. When the union representative named John Earl Stevens first came to the Planet Hollywood project site, he wanted to speak with whoever was in charge. **Exhibit F**, Mitchell Depo., 16:21-24; 19:6-12. Fully aware of his limited authority as a trainee, Mitchell passed the union representative to Leach, the senior project manager on site. *Id.*, 16:21-17:5 ("... he came actually to our offices that we had on site, asked to speak to who was in charge. So I gave him Jason, and I sat there ..."). Thus, knowing that Mitchell was not even in charge on this particular construction site, it would be unreasonable for Local 872 or its representatives to believe Mitchell had the authority to bind PWI in any way to any labor agreement.[2] *See Par-knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 55 (3rd Cir. 1980) ("As one moves down the spectrum from the seat of corporate power to menial employees, the likelihood that the signature of such employee is intended to bind the corporation is reduced.")

The Trust Funds essentially acknowledge that Mitchell did not have authority to sign the Memorandum Agreement by refusing to provide any information regarding how it came to be signed or who purportedly obtained Mitchell's signature (again, Mitchell does not recall seeing or signing it). Rather than provide any evidence, as is necessary to defeat summary judgment, the Trust Funds repeatedly claim in their discovery responses that the provenance of the Memorandum Agreement is irrelevant to their claim for an audit, and instead entirely rely on the certification language in the remittance reports April Meneou submitted.

Thus, as all of the evidence shows that Mitchell did not have authority to sign the memorandum agreement (even assuming he did sign it), the Memorandum Agreement cannot bind PWI to the Master Agreement, and thus, PWI cannot be required to submit to a Trust Fund audit.

**C.    The Remittance Reports Are Insufficient to Bind PWI to the Master Agreement**

Just as Mitchell had no authority to bind PWI to a union contract, neither did April Meneou, an employee whose chief duty is payroll. The Trust Funds, however, claim that the language on the

---

[2] Additionally, the actual Memorandum Agreement first refers to the company as Price Woods, Inc., the prior iteration of PWI Construction, Inc., which has been defunct for years. **Exhibit G**, Memorandum Agreement; **Exhibit L**, Secretary of State Business Entity Printout for Price Woods, Inc. It is highly likely that anybody within the company with authority would have noticed and corrected this error as Price Woods, Inc. does not exist.

remittance reports and Meneou's submission of those reports is sufficient to bind PWI to the Master Agreement. This simply is not so.

The specific language contained in the remittance reports which the Trust Funds rely on states:

> On behalf of the above stated employer, I certify and/or acknowledge the following:
>
> 1. That I am authorized by the above stated employer to make this certification and/or acknowledgement.
>
> 2. That the employer is, and by signing below, confirming that it is signatory and *bound to the applicable project agreement, shop agreement, or current master labor agreement* (MLA) of the Southern Nevada Laborers Local 872 and its affiliated local Unions, and any modifications or renewals thereof.
>
> 3. [Certification of accuracy.]
>
> 4. That this report is made pursuant to the appropriate project agreement, shop agreement, MLA, and/or any written agreements applicable to the Trust Funds as required by Section 302(c)(5)(B) of the "Labor Management Relations Act."

**Exhibit J**, Remittance Report (emphasis added). Meneou's signature to such statements is insufficient to bind PWI to the MLA for at least two principle reasons: 1) Meneou did not have the requisite authority to bind PWI to a union contract by signing and submitting the certifications, and 2) the certifications are not sufficiently clear as to bind PWI to the Master Agreement.

### 1. Meneou Lacked Authority to Sign the Certifications

Meneou's job duties consist of "processing the biweekly payroll, and tax records that go along with payroll, filing quarterly reports. That's about it." **Exhibit H**, Meneou Depo., 10:11-14. Further, the Trust Funds have produced no evidence that anyone with authority authorized Meneou to sign the remittance reports. In fact, Meneou's supervisor never saw the remittance reports, much less authorized Meneou to sign them. **Exhibit I**, Lipka Depo., 25:5-21, 27:10-28:9. Lipka, Meneou's supervisor, only knew that they were sending checks to the Trust Funds because they had union labor on the Planet Hollywood *project*, and was unaware of any certifications or remittance reports. *Id.*, 25:5-21, 26:21-27:5. Additionally, Lipka never informed anyone higher up in the company, those with authority to bind PWI to a union agreement, of what was going on. *Id.*, 29:2-6, 30:3-22. As Meneou did not have actual authority, express or implied, she would need apparent

authority in order for her "certifications" to actually bind PWI.

### 2. Meneou Lacked Apparent Authority to Sign the Certifications

Meneou did not have apparent authority to sign or otherwise bind PWI to any labor agreement, much less a Master Agreement. In order for an agent to have apparent authority, as discussed above, the principal must make objective manifestations to the third party demonstrating authority in the agent. *See Donkin's Inn*, 532 F.2d at 141; *see also Oakview Constr.*, 2011 U.S. Dist. LEXIS 95722, at *9-10 ("apparent authority is created where both the third party and the principal know of the actions of the agent, and the principal fails to object even though it could have easily done so.") Importantly, "apparent authority cannot be established merely by showing that [the agent] *claimed authority or purported to exercise it*, but must be established by proof of something said or done by the [principal] on which [the third-party] relied." *Iron Workers*, 124 F.3d at 1099 (emphasis added).

Here, the Trust Funds entirely rely on Meneou's signing of the remittance reports and the certification language therein for the proposition that she could sign them and make the certifications.[3] However, the Trust Funds present no evidence of anything PWI did or said to Local 872 or any of its agents giving them reason to believe that Meneou had authority to sign these documents or bind PWI to a labor agreement. Her own signature asserting such is insufficient, as it is, at best, only her own claim to authority and not a representation from PWI. *See id.* Furthermore, there is no evidence that she actually read the language at issue. Further, no one with authority at PWI ever knew of or even saw the remittance reports. **Exhibit I**, Lipka Depo., 27:10-28:10; **Exhibit D**, Ferguson Depo., 31:15-32:3, 33:15-24; *Oakview Constr.*, 2011 U.S. Dist. LEXIS 95722, at *9-10 ("Apparent authority is created where both the third party *and the principal* know of the actions of the agent, and the principal fails to object even though it could have easily done so.") (emphasis added) (citations omitted). Thus, without some showing that PWI represented or acted in a way demonstrating that Meneou had authority, Meneou lacked the apparent authority to sign the certification statements and, thereby, bind PWI to any labor agreement.

---

[3] And, based on their discovery responses, the Trust Funds entirely rely on the remittance reports for their contention that PWI is bound to the Master agreement. **Exhibit K**, Plaintiffs' Responses to Interrogatories.

11.

### 3. The Certifications Do Not Bind PWI to a Master Labor Agreement

Even if Meneou had authority to sign the certification statement on the remittance reports, the certification language is not specific as to what it purports to bind a signatory to. Rather, the certification language certifies that an employer is bound to any of a number of different types of agreements: **a project agreement**, shop agreement, or a master labor agreement. The language does not specify to which of these agreements the employer is bound, it just certifies that the employer is bound to some agreement. In this case, PWI had agreed to hire union laborers to do clean-up work, and Meneou submitted trust fund reports *solely* on the Planet Hollywood project. Thus, even had Meneou read or been authorized to sign what she was signing, her actions and the remittance reports were consistent with her belief and PWI's intent to only hire union laborers (or any laborers directly and not through subcontractors) on the Planet Hollywood project. PWI's intent to only hire union laborers for the Planet Hollywood project is evident in its actions at all times prior to and after the Planet Hollywood project as it never otherwise directly hired laborers of any kind, but only sublet that work. **Exhibit D**, Ferguson Depo., 14:24-15:7.

Further, while courts have found that entities can adopt a union contract through conduct, *see S. Cal. Painters & Allied Trade Dist. Counsil No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1131 (9th Cir. 2004), PWI's conduct did not demonstrate adoption of anything beyond a project agreement at best. *See Cent. States, Se. & Sw. Areas Pension Fund v. Gen. Materials, Inc.*, 535 F.3d 506, 509-10 (6th Cir. 2008) (determining that certification clauses were insufficient to extend a company's obligations under a CBA). Here, PWI hired a number of Local 872 laborers to conduct clean-up on a job contrary to their normal policy of subcontracting out that labor specifically so that they could hire union laborers. **Exhibit E**, Leach Depo., 62:9-13; **Exhibit D**, Ferguson Depo.,14:14-15:11, 20:15-22:1. After the Planet Hollywood project, PWI did not hire any union or non-union labor, but rather sublet that work as per its normal operating procedure. **Exhibit D**, Ferguson Depo.,14:14-15:11. Thus, none of PWI's conduct, whether the hiring of union laborers or the submission of remittance reports, demonstrates anything other than an intent to have a single project agreement with Local 872 at best. There is no evidence that PWI performed on the Master Agreement on any other job within the jurisdiction of Local 872, whether during the time period in which it *fully*

*complied* with Local 872's terms on the Planet Hollywood project, or at any other time.

D.   **The Trust Funds Sole Claim for an Audit Is Moot**

The sole claim in the Trust Funds' Complaint is for an audit. Specifically, the Trust Funds claim that pursuant to the Master Agreement, PWI is obligated to make its books and records available for an audit by the Trust Funds. However, during this litigation, PWI has provided the Trust Funds with all of the papers and documentation necessary to permit the Trust Funds or their designee to perform an audit. Thus, the Trust Funds' claim is now moot.[4]

In essence, the Trust Funds' claim is that PWI failed to provide the requested payroll documents regarding two particular workers (Dexter Martial and Leopoldo Gonzales) who worked on a PWI job in 2011, and a list of all jobs PWI worked on in Southern Nevada in 2009, 2010, and 2011. **Exhibit M**, Email from Auditor to April Meneou dated February 10, 2012. The Auditor claimed that these were the documents he needed in order to present his audit to the Trustees at a meeting scheduled for February 23, 2012. *Id.* The Trust Funds again focused on these documents in an April 10, 2012 letter from their attorneys to PWI, stating:

> Specifically, PWI has failed to respond to repeated requests for the following documents:
>
> 1. Payroll documents for the following employees:
>
>    a. Martial, Dexter and
>
>    b. Gonzalez, Leopoldo.
>
> 2. List of jobs that PWI worked on in Southern Nevada in 2009, 2010, and 2011.

**Exhibit N**. However, as part of the discovery process in this case and despite the information being irrelevant to the actual question of whether PWI was required to submit to an audit, PWI has provided this exact information to the Trust Funds (and more), allowing them to complete their audit, and mooting their claim. *See* **Exhibit O**, Defendant's Supplemental Disclosures Pursuant to FRCP 26(a)(1).

. . .

---

[4] PWI recognizes that the Trust Funds also seek an award of attorneys' fees, though that is not a claim. Any entitlement to attorneys' fees, which PWI argues does not exist, can be determined by a separate motion seeking such.

13.

The Trust Funds may argue that their claim is not moot because PWI could refuse an audit in the future. However, PWI would not be subject to any audit in the future regardless of whether it was ever party to the Master Agreement. As will be explained below, even if PWI was ever bound by the Master Agreement, it no longer is as it has lawfully repudiated the Master Agreement pursuant to the one-employee unit rule. Thus, PWI either never has been a party to the Master Agreement or is no longer a party to the Master Agreement. Thus, because PWI cannot be subject to an action for an audit in the future and as it has provided the Trust Funds with all of the required documents for a current audit, the Trust Funds' claim is now moot.

### E.  PWI Has Lawfully Repudiated the Master Agreement

Even if PWI was previously bound to a collective bargaining contract, it lawfully "repudiated" any such agreement on June 18, 2012, when it sent correspondence to the Union repudiating any agreement it may have had based on the "one person bargaining unit rule." (Exhibit 1 to attached **Exhibit A,** Declaration of Marc Ferguson). The alleged collective bargaining agreement covers employees performing laborers' work in Southern Nevada. Such employees would therefore be in the "bargaining unit" allegedly covered by a Laborers' Union contract.

The National Labor Relations Board ("NLRB") and the Ninth Circuit have held that when an employer has zero or only one person in a bargaining unit it can repudiate at such time. In *Laborers Trust Funds v. Westlake Development*, 53 F.3d 979 (9th Cir. 1995), the Ninth Circuit reviewed several NLRB decisions which held that it was not a violation of the National Labor Relations Act for an employer to repudiate a collective bargaining agreement if it had only one employee or no employees in the bargaining unit. The Court reviewed *Haas Garage Door Co.*, 308 NLRB 1186 (1992); *Kirkpatrick Elec. Co.*, 314 NLRB 1047 (1994); *Searls Refrigeration Co.*, 297 NLRB 133 (1989); and *Stack Elec. Inc.*, 290 NLRB 575 (1988).

After favorably reviewing this NLRB case law, the Court specifically held that the one person bargaining unit repudiation rule applied to ERISA litigation. (*Westlake*, like the case at hand, involved trust fund litigation under ERISA.) *Westlake, supra*, at 983-984. Specifically, the Court stated:

> The obligation to contribute to the Trust Funds depends on the

> existence of employment covered by the CBA. Once the CBA was lawfully repudiated, there was no longer any covered employment and thus there was no duty of Westlake to contribute to the Trust Funds.

*Id.* at 984.

Further, this case is similar to *Whiting-Turner Contracting Co. v. Local Union No. 7*, 15 F. Supp. 2d 162 (Mass. D.C. 1998). PWI is a "briefcase contractor." It manages construction contracts but does not self-perform the work. **Exhibit D**, Ferguson Depo., 39:24. Instead it subcontracts such work. *Id.*, 14:14-20. In *Whiting-Turner*, the employer was a Maryland-based corporation which oversaw work as a construction manager throughout the United States. 15 F. Supp. 2d at 163. When confronted by a union agent on a project in Massachusetts, who contended the company was bound to a union agreement that prohibited it from subcontracting bargaining unit work to a non-union subcontractor, the company repudiated the agreement based on the one-person bargaining unit rule. The Court upheld the repudiation.

PWI traditionally does not self-perform any construction work and therefore has not had any bargaining unit work for most of its existence. (**Exhibit A**, Ferguson Decl., ¶ 3). The limited exceptions to this rule have long since passed. At the time the repudiation letter was sent, PWI had no bargaining unit employees and had no intention of hiring any in the future. (**Exhibit A**, Ferguson Decl., ¶ 8-15). The Plaintiff Trust Funds may contend that employees of Labor Ready were employees of PWI. That is not true. Labor Ready was a subcontractor. In any event, PWI stopped using Labor Ready in Nevada at least several months before the repudiation letter was sent and has no intention of utilizing them again. (**Exhibit A**, Ferguson Decl., ¶ 8-14).

## IV.  CONCLUSION

In sum, PWI never became obligated under the Master Agreement because no one with authority signed the Memorandum Agreement purporting to bind PWI. Regardless of whether Mitchell signed the Memorandum Agreement, and there is no evidence that he did, he did not have actual or apparent authority to do so. Further, Meneou lacked the authority to bind PWI to the Master Agreement through submitting remittance reports, which were not even clear as to what they were certifying. Even if PWI were somehow obligated under the Master Agreement at some time in the past, it has provided the Trust Funds the relief they sought in their claim, the documentation they

requested to conduct an audit. Thus, because PWI cannot be obligated to submit to an audit at any point in the future, as it has lawfully disavowed its nonexistent obligation under the Master Agreement pursuant to the one-employee unit rule, the Trust Funds' sole claim is now moot. Accordingly, PWI respectfully requests the Court grant summary judgment in PWI's favor on the Trust Funds' sole claim.

Dated:  January 16, 2013

Respectfully submitted,

*/s/ James T. Winkler*

JAMES T. WINKLER, ESQ.
ROGER L. GRANDGENETT, II, ESQ.
LITTLER MENDELSON

Attorneys for Defendant
PWI CONSTRUCTION, INC.

LITTLER MENDELSON
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

16.

## PROOF OF SERVICE

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is 3960 Howard Hughes Parkway, Suite 300, Las Vegas, Nevada 89169-5937. On January 16, 2013, I served the within document(s):

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[x] By CM/ECF Filing – Pursuant to FRCP 5(b)(3) and LR 5-4, the above-referenced document was electronically filed and served upon the parties listed below through the Court's Case Management and Electronic Case Filing (CM/ECF) system:

Adam P. Segal, Esq.
Bryce C. Loveland, Esq.
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV  89106-4614

*Attorney for Plaintiffs*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing and for shipping via overnight delivery service. Under that practice it would be deposited with the U.S. Postal Service or if an overnight delivery service shipment, deposited in an overnight delivery service pick-up box or office on the same day with postage or fees thereon fully prepaid in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 16, 2013, at Las Vegas, Nevada.

_____
Kimberly Gregos

Firmwide:117366475.2 071834.1001